IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CARROLLTON FAMILY CLINIC, LLC,
a Mississippi Limited Liability
Company, and PERRIN CURRAN,
M.D., an individual,

Plaintiffs,

v.

ECLINICALWORKS, LLC, a Delaware
Limited Liability Company,

Defendant.

Case No. 17-12530

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.      Plaintiffs Carrollton Family Clinic, LLC ("CFC") and Perrin Curran, M.D.,

are in the business of providing healthcare to patients.  Each contracted with and paid

Defendant eClinicalWorks, LLC ("ECW") for software that satisfied the certification

criteria of the Meaningful Use program, a federal government program that sets

nationwide standards for certified Electronic Health Records ("EHR") software and

provides monetary incentives to encourage providers to use EHR software that met

those standards.

2.      To induce Plaintiffs and tens of thousands of other businesses and

professionals to use its software (and pay higher prices for it), ECW repeatedly and

expressly guaranteed that its software in fact satisfied and would continue to satisfy the

certification criteria of the Meaningful Use program.  ECW also expressly promised in

many contracts with its customers, including contracts with each of the Plaintiffs, to

update its software to ensure compliance with federal requirements.  ECW separately promised in many contracts, including its contract with Plaintiff CFC, to provide credits of certain fees paid by customers in the event that its software failed to satisfy the certification criteria established by the Meaningful Use program.

3.     ECW's software failed to live up to ECW's promises and guarantees, and its statements about its software's current compliance with the certification criteria of the Meaningful Use program were outright false.  In fact, the software did not meet the certification criteria for many years, through and including at least August 2016.

4.     On May 31, 2017, the United States Department of Justice announced that ECW had agreed to pay $155 million and enter into a Corporate Integrity Agreement to settle the Department of Justice's claims under the False Claims Act and Anti-Kickback Statute.  The central allegation in the Department of Justice's lawsuit was that ECW falsely obtained certification for its EHR software when it concealed that its software did not comply with the Meaningful Use program's requirements for certification.

5.     Plaintiffs bring suit to recover damages and obtain restitution for ECW's fraud and breaches of contract on behalf of themselves and all others similarly-situated.

## I.     PARTIES

### A.     Plaintiffs

#### 1.     Carrollton Family Clinic

6.     Plaintiff Carrollton Family Clinic LLC ("CFC") is a Mississippi Limited Liability Company based in North Carrollton, Mississippi.

7.     Kara White is the sole member of CFC.  Ms. White is a registered nurse practitioner.  Ms. White has sometimes used her maiden name, McKay, in her dealings with ECW.

8.     CFC's principal business is the provision of primary care services to patients.

### 2.     Dr. Perrin Curran

9.     Plaintiff Perrin Curran, M.D., is an individual who resides in California.

10.     Dr. Curran is a partner in Primary Health Partners, a California partnership.  Primary Health Partners previously operated under the name North County Medical Associates.  Dr. Curran has been a partner in Primary Health Partners since before 2005.  Primary Health Partners has assigned all claims it had against ECW to Dr. Curran.

11.     Dr. Curran is a medical doctor specializing in primary care for adults.

### B.     Defendant ECW

12.     Defendant eClinicalWorks, LLC ("ECW") is a Delaware Limited Liability Company with headquarters in Westborough, Massachusetts.

13.     ECW's principal business has been the provision of software and services relating to Electronic Health Records ("EHR") to healthcare providers.

## II.     JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because the amount in controversy exceeds $5,000,000 and because ECW is a citizen of Massachusetts, while Plaintiffs are citizens of other States.

15.     ECW is subject to both general and specific personal jurisdiction in Massachusetts.  ECW is headquartered in Massachusetts, is at home in Massachusetts, conducts substantial business in Massachusetts, and purposefully placed its software and services into the stream of commerce within Massachusetts and throughout the United States.  Upon information and belief and, as explained in more detail below, Plaintiffs' claims arise from ECW's misconduct in Massachusetts because ECW drafted the terms of its contracts in Massachusetts, drafted and published its false representations concerning its products in Massachusetts, and made the relevant decisions concerning the design of its software in Massachusetts.

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because ECW's headquarters is located within the District of Massachusetts and a substantial part of the events giving rise to the claims alleged herein occurred within this District.

17.     ECW's contracts with each Plaintiff state that Massachusetts law will apply.  Upon information and belief, ECW has entered into thousands of contracts containing the same or similar choice-of-law provisions.

## III.    FACTS COMMON TO ALL COUNTS AND PARTIES

### A.    Certified EHR Software Must Satisfy the Certification Criteria of the Meaningful Use Program.

18.     On February 17, 2009, the Health Information Technology for Economic and Clinical Health (HITECH) Act (*see* Public Law Public Law 111-5; 42 U.S.C. §§ 201, 300jj, et seq.) was enacted to promote the adoption and meaningful use of certified EHR technology.  Under the HITECH Act, the Government established a certification

program for EHR technology.  As part of the certification program, EHR vendors like ECW attest to authorized certification bodies and accredited testing laboratories that their software meets the certification requirements established by the Government.  The certification bodies and testing laboratories test and certify that vendors' EHRs are compliant with the certification requirements.

19.     Through the Meaningful Use program, the Government makes incentive payments to healthcare providers for demonstrating meaningful use of certified EHR technology.  Individual practitioners (Eligible Professionals) could qualify for up to $43,720.00 over five years from Medicare (ending after 2016) and up to $63,750.00 over six years from Medicaid (ending after 2021).

20.     In order to qualify for incentive payments under the Meaningful Use program, Eligible Professionals were required, among other things, to: (1) use an EHR system that qualified as certified EHR technology; and (2) satisfy certain objectives and measures relating to their meaningful use of the certified EHR technology.

21.     The Government has implemented the certification criteria and incentive payment requirements in multiple stages. On January 13, 2010, the interim final rules setting forth the "2011 Edition" certification criteria and a proposed rule setting forth the "Stage 1" requirements for incentive payments were published.  These rulemakings were finalized on July 28, 2010.  In Stage 1, an Eligible Professional's use of certified EHR technology generally needed to satisfy fifteen "core objectives" and five out of ten "menu set objectives."

22.     On September 4, 2012, the final rules setting forth the "2014 Edition" certification criteria and "Stage 2" requirements for incentive payments were published. In Stage 2, an Eligible Professional's use of certified EHR technology generally needed to satisfy seventeen "core objectives" and three out of six "menu set objectives."

23.     To qualify for incentive payments in each Stage of the Meaningful Use program, healthcare providers were required to attest each year that they used certified EHR technology and satisfied the applicable Meaningful Use objectives and measures.

24.     To obtain certification, EHR vendors must attest to an authorized certification body that their EHR product satisfies the applicable certification criteria, submit to certification testing by an accredited testing laboratory, and pass such testing.

25.     Certification testing is based on the certification criteria the vendor represents its software satisfies and on which it requests to be tested and certified. The certification body uses standardized testing protocols ("test scripts"), which identify each step the vendor will be required to take during testing. The test scripts are available to vendors in advance of their testing date.

26.     After obtaining certification, an EHR vendor must maintain that certification by complying with all applicable conditions and requirements of the certification program. Among other things, the EHR product must be able to accurately, reliably, and safely perform its certified capabilities. EHR vendors must cooperate with the processes established by the Government for testing, certifying, and conducting ongoing surveillance and review of certified EHR technology.

27.     The rules governing the Meaningful Use program recognize that healthcare providers rely on certification for assurance that an EHR product meets the applicable certification criteria, including that it possesses the certified capabilities that healthcare providers will need to use to achieve relevant objectives and measures, and that the software will perform in accordance with applicable certified capabilities.

**B.     <u>ECW Promised That Its Software Would Be Updated to Comply with Federal Requirements and to Credit Certain Fees if Its Software Failed to Satisfy the Certification Criteria of the Meaningful Use Program.</u>**

28.     When ECW agrees to sell, license, or otherwise grant access to its software, ECW and its customers generally execute written contracts.   Upon information and belief, ECW has executed thousands or tens of thousands of contracts for the sale or license of its EHR software that state, in sum or substance: "eClinicalWorks represents and warrants that the eClinicalWorks Products will meet the 'Meaningful Use' certification criteria as defined by the American Recovery and Reinvestment Act (ARRA). If eClinicalWorks Products do not get certified or fails [sic] to meet the certification criteria eClinicalWorks will credit twelve (12) months of maintenance fees."   As explained more fully below, Plaintiff CFC executed a contract with ECW containing this provision.

29.     ECW charged "maintenance fees" for ECW's performance of upgrades necessary to maintain and improve the functionality of its software, including (without limitation) upgrades needed to ensure compliance with the requirements of the Meaningful Use program.

30.     Upon information and belief, ECW has executed thousands or tens of thousands of contracts for the sale or license of its EHR software that state, in sum or substance: "eClinicalWorks represents and warrants that eClinicalWorks will update Products (including, but not limited to, content usage for drug database and drug interaction checks, E&M Coding Advisor) as necessary to ensure that such product complies with the most current federal or state requirements."  As explained more fully below, each Plaintiff executed a contract with ECW containing this provision.

### C.     ECW Falsely Stated That Its Software Currently Satisfied and Would Continue to Satisfy the Certification Criteria of the Meaningful Use Program.

31.     Between 2009 and May 30, 2017, ECW repeatedly expressly represented in writing that its software satisfied and would continue to satisfy all the certification criteria applicable to Complete EHRs.

32.     An ECW press release dated January 14, 2010 and titled "2009 Banner Year for eClinicalWorks" states: "In 2010, eClinicalWorks continues to work closely with customers to help them become meaningful users as defined through the American Recovery and Reinvestment Act of 2009 (ARRA), offering the following:

**Guarantee**—eClinicalWorks guarantees that its software will meet the meaningful use criteria, as defined through ARRA, thereby reducing the risk that practices face in investing in new technology."  (emphasis in original.)

33.     The press release described in the preceding paragraph also states: "'2009 was successful on multiple levels and we are looking forward to an even brighter 2010,' said Girish Kumar Navani, CEO and co-founder of eClinicalWorks. 'Part of its success

is due to a shorter learning curve for our solutions. This year, our focus is to continue

managing our growth and provide the training and support our customers will need to

become meaningful users. We are deeply committed to helping each of our customers

take advantage of the stimulus incentives, ensuring that they are using eClinicalWorks

to best suit their practices, including utilizing clinical decision support, eprescribing and

quality measures features that are inherent in the system.'"

34.     An ECW press release dated October 1, 2010 states: "eClinicalWorks®,

announced today that eClinicalWorks EMR VERSION 8.0.48 is 2011/2012 compliant

and was certified as a Complete EHR on October 1 2010 by the Certification

Commission for Health Information Technology (CCHIT®), an ONC-ATCB, in

accordance with the applicable ELIGIBLE PROVIDER certification criteria adopted by

the Secretary of Health and Human Services. The 2011/2012 criteria support the Stage 1

meaningful use measures required to qualify eligible providers and hospitals for

funding under the American Recovery and Reinvestment Act (ARRA).  'We see the

value of The Meaningful Use certification. We felt it was important to demonstrate

leadership and be one of the earlier companies to go through the process,' said Girish

Kumar Navani, CEO and co-founder of eClinicalWorks. 'We believe the certification

process lends further credibility and assurance to our customers. I also recognize and

acknowledge the work and effort that goes into the certification process.'"

35.     Between October 31, 2010 and November 2, 2010, ECW hosted a national

user conference at Kissimmee, Florida.  ECW provided guidance on using ECW to attest

to Meaningful Use through the conference, including various showcases on Meaningful

Use, Adoption, and Quality Measure Dashboards.

36.     In or around April 2011, ECW published a pamphlet titled "Meaningful

Use Resources and Frequently Asked Questions."  The pamphlet states:

"eClinicalWorks commits to having our comprehensive EHR solution certified such that

clients can meet all aspects of Meaningful Use with eClinicalWorks. This will require

the usage of our PM (patient information/demographics), EMR, e-Prescribing, Patient

Portal, and P2P solution suite. The eClinicalWorks Meaningful Use task force is

evaluating the certification strategy."  The pamphlet also states: "Does eCW guarantee

meeting requirements of Meaningful Use?  eClinicalWorks guarantees that our software

will meet the Meaningful Use criteria as defined through ARRA, thereby reducing the

risk that practices face in investing in new technology."

37.     An ECW press release dated April 14, 2011 states: "eClinicalWorks®, a

market leader in ambulatory clinical systems, today announced that 2,000 practices

have successfully upgraded to Version 9, the company's meaningful use (MU) version,

which, with electronic prescribing and the eClinicalWorks Patient Portal, has received

2011/2012 ONC-ATCB Complete EHR certification by the Certification Commission for

Health Information Technology (CCHIT ®). . . . To further provide meaningful use

education, eClinicalWorks is conducting a series of RoadShows across the nation for

medical providers, clinical staff and office administrators. These are free interactive

sessions on all 25 requirements of MU that also demonstrate new features. There are

also daily free Webinars educating customers on MU. With the MAQ Dashboards,

RoadShows, Webinars, newsletters, MU Assessment, and others, eClinicalWorks has developed tools and educational resources to aid providers in becoming meaningful users."

38.     An ECW press release dated October 23, 2011 states: "'eClinicalWorks prides itself in demonstrating market leadership that enables practices to pursue quality of care initiatives, including meaningful use,' said Girish Kumar Navani, CEO and co-founder of eClinicalWorks. 'Since this initiative was announced, we have been diligent in ensuring that our customers have the tools and education on the guidelines to meet meaningful use.'"

39.     ECW submitted an attestation form dated April 17, 2013 to an authorized certification body representing that its software satisfied the certification criteria applicable to Complete EHRs and was capable of performing those criteria and standards in the field.

40.     An August 5, 2013 ECW press release titled "eClinicalWorks V10 Receives 2014 ONC HIT Certification" states: "eClinicalWorks® announced today that eClinicalWorks V10 is compliant with the ONC 2014 Edition criteria and was certified as a Complete EHR on July 24, 2013 by the Certification Commission for Health Information Technology (CCHIT®), an ONC-ACB, in accordance with the applicable Eligible Provider certification criteria adopted by the Secretary of Health and Human Services. The ONC 2014 Edition criteria support both Stage 1 and 2 meaningful use measures required to qualify eligible providers and hospitals for funding under the American Recovery and Reinvestment Act (ARRA)."

41.     An ECW pamphlet dated February 4, 2014 titled "We are eClinicalWorks" states: "eClinicalWorks V10 is compliant with the ONC 2014 Edition criteria and was certified as a Complete EHR on July 24th, 2013 by the Certification Commission for Health Information Technology (CCHIT®), an ONC-ACB. eCW Certification 2014 Edition Number: CC-2014-955447-1."

42.     An ECW pamphlet dated June 2014 titled "V10 Feature Highlights" states: "eClinicalWorks V10 is compliant with the ONC 2014 Edition criteria and was certified as a Complete EHR on July 24, 2013 by the Certification Commission for Health Information Technology (CCHIT®), an ONC-ACB, in accordance with the applicable Eligible Provider certification criteria adopted by the Secretary of Health and Human Services. The ONC 2014 Edition criteria support both Stage 1 and 2 Meaningful Use measures required to qualify eligible providers and hospitals for funding under the American Recovery and Reinvestment Act (ARRA)."

43.     As of March 15, 2015, ECW's website stated that its EHR software "provides all of the features needed for qualifying to receive Meaningful Use reimbursement for Stage 1, Stage 2 and beyond."

44.     Upon information and belief, discovery will confirm that ECW has consistently and repeatedly made similar representations to Plaintiffs and other similarly-situated ECW customers and former customers between February 2009 and the present.

**D.     ECW Intended for Customers and Potential Customers to Rely on Its Assurances That Its Software Would Satisfy the Certification Criteria of the Meaningful Use Program.**

45.     ECW understood that its statements concerning its software's present and future satisfaction of the certification criteria of the Meaningful Use program, such as those cited in Section III.C above, were material to its customers and intended for customers to rely on them.

46.     ECW understood that its customers would rely on the certification of ECW's software by an authorized certification body as an assurance that ECW's software in fact satisfied the certification criteria of the Meaningful Use program.

47.     ECW intended for the certification of its software by an authorized certification body and its statements concerning its software's present and future satisfaction of the certification criteria of the Meaningful Use program to persuade healthcare providers to contract with ECW and/or pay money to purchase, license, or otherwise use ECW's software.

48.     Plaintiffs and the members of the Proposed Class and Subclasses (defined below) actually relied upon ECW's statements that its software did and would satisfy the certification criteria of the Meaningful Use program.

**E.     Contrary to ECW's Statements and Promises, ECW's Software Did Not Satisfy the Certification Criteria of the Meaningful Use Program for Many Years.**

49.     Contrary to ECW's certification to authorized certification bodies, its statements directed at current and potential customers, its statements to the Plaintiffs, and its contractual promises to Plaintiffs and others similarly-situated, ECW's software

did not satisfy the certification criteria for a Complete EHR and could not operate in the field in compliance with the requisite certification criteria.  The below examples are illustrative of the many deficiencies of ECW's software.  Upon information and belief, discovery will identify additional deficiencies.

      **1.**    **ECW's Software Failed to Satisfy the Meaningful Use Certification Criteria Requiring EHR Technology to Generate and Transmit Prescriptions Electronically Using the RxNorm Prescription Nomenclature.**

50.    The Stage 2 Meaningful Use certification criteria required certified EHR technology to, among other things, generate and transmit prescriptions electronically (commonly referred to as ePrescriptions) using the capabilities and standards specified at 45 C.F.R. § 170.314(b)(1)(iii), (b)(3), which requires the use of RxNorm.  *See* 45 C.F.R. § 170.207(d)(2).

51.    Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, RxNorm is a standardized drug vocabulary that specifies each unique drug, formulation, and dosage.  RxNorm codes provide a mechanism for ensuring the accuracy of ePrescriptions and for allowing EHR systems to communicate and interact accurately and efficiently with other EHR systems, with pharmacies, and health information networks.

52.    Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, on its 2013 application for certification under the 2014 Edition of the certification criteria, ECW attested that it satisfied the requirement to implement the RxNorm vocabulary.  However, at that time and for years afterwards,

ECW had not implemented the RxNorm vocabulary into its electronic prescription functions.  The attestations related to RxNorm in ECW's application for certification were false.

53.     Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, ECW was aware that its software did not satisfy the requirement to implement the RxNorm vocabulary, as demonstrated by the following allegations, set forth in the Department of Justice's Complaint against ECW:

a.     In advance of its certification testing, ECW reviewed the publicly available test scripts for ePrescribing and identified the sixteen drugs for which ECW would need to generate a prescription during testing.

b.     ECW then "hardcoded" into its testing software only the sixteen RxNorm codes it knew in advance that its certification body would test.  In other words, rather than programming the capability to retrieve any code from the entire database of RxNorm codes, ECW simply typed the sixteen RxNorm codes necessary for testing directly into its software. ECW hardcoded the requisite RxNorm codes for the purpose of making its certification body believe it had implemented the RxNorm drug vocabulary and to pass certification testing.

c.     In internal communications following certification in 2013, ECW employees acknowledged that ECW's software did not transmit RxNorm codes for ePrescriptions.

d.     In May 2015, ECW was re-tested by its certification body on its ability to transmit RxNorm codes as required for ePrescribing.  ECW knew in

advance that its certification body would simply re-test its software using the same testing protocol, including the same sixteen RxNorm codes that ECW had hardcoded to pass its original testing in 2013.  As a result, despite still failing to transmit RxNorm codes in practice, ECW's software passed this surveillance testing.

      e.     Instead of adopting RxNorm codes, ECW relied on either proprietary drug identifiers developed by private business partners or on National Drug Codes (NDCs) for purposes of transmitting prescriptions.

      f.     In some cases ECW's software did not send accurate NDC codes when transmitting medication orders. ECW was aware of this issue and was advised by a third party business partner in 2014 and 2015 that prescriptions were being sent with drug descriptions that did not match the transmitted NDC code.  ECW acknowledged in a Patient Safety Advisory dated December 16, 2015 that there was a risk that incorrect NDC codes would be transmitted for certain custom medications.

      g.     In January 2016, ECW conducted a series of meetings relating to RxNorm codes and its issuance of inaccurate NDC codes.

      h.     On December 23, 2016, after learning of the Government's investigation of ECW's alleged violations of the False Claims Act, ECW informed the Government that before August 2016, it had not included RxNorm codes when transmitting ePrescriptions. ECW stated that for most customers, it had implemented the RxNorm vocabulary for ePrescriptions by August 2016.

54.     ECW admitted in a January 27, 2017 notice from ECW to its customers: "For the Electronic Prescribing core measure, prior to August 4, 2016, eClinicalWorks included NDC codes (and for Medispan customers, eClinicalWorks also included a drug identifier RxNorm/ DDID code from the Medispan drug database) instead of RxNorm / RxCUI codes when transmitting electronic prescriptions to Surescripts. eClinicalWorks began including RxNorm/RxCUI codes with all electronic prescriptions on August 4, 2016. . . . In addition, prior to December 2, 2016, for Cerner Multum customers only, eClinicalWorks transmitted medication names and descriptions instead of RxNorm/RxCUI codes. . . . eClinicalworks requested confirmation from CMS [(Center for Medicare and Medicaid Services)] that it was proper to give its customers numerator credit for the Electronic Prescribing . . . core measure[] notwithstanding the aforementioned distinctions. CMS responded to eClinicalWorks on January 20, 2017, and informed eClinicalWorks that it is not proper to give customers numerator credit for [the Electronic Prescribing core measure] for the applicable time periods in which these distinctions existed."

55.     ECW's CEO Girish Navani admitted in a letter to ECW's customers dated June 1, 2017 that "[f]rom 2014 to August 2016, electronic prescriptions sent by eClinicalWorks users included NDC codes rather than RxNorm codes" and that there had been a "failure to include RxNorm codes in electronic prescriptions" during this time period.

56.     Because ECW's software did not use the required RxNorm codes in electronic prescriptions for at least the time period between 2014 and August 2016, it did not satisfy all the Meaningful Use certification criteria.

**2.      ECW's Software Failed to Satisfy Meaningful Use Certification Criteria Requiring EHR Technology to Reliably and Automatically Perform Checks of Drug Formularies or Preferred Drug Lists for Patients.**

57.     The Stage 2 Meaningful Use criteria required certified EHR software to automatically and electronically check whether a drug formulary or preferred drug list exists for a given patient.  45 C.F.R. § 170.314(a)(10).  The Department of Health and Human Services explained on September 4, 2012 that this "criteria was designed to ensure that a drug formulary check poses minimal burden on [Eligible Professionals], [Eligible Hospitals], and [Critical Access Hospitals]. Further, the revision [of the criteria] we have included specifies that EHR technology must perform an automated check for the existence of a drug formulary that is specific to a patient for the medication to be prescribed. In other words, an EHR technology would not satisfy this revised certification criterion if it provided a hyperlink to a patient's drug formulary that an EP, EH, or CAH then had to manually open and navigate."

58.     ECW did not meet this requirement and instead required users of its software to go through a separate manual process to check the existence of a formulary or preferred drug list on a patient-by-patient basis.

59.     For example, ECW acknowledged in a pamphlet dated August 2015 that its users had to engage in an "Auto Rx Eligibility Check Validation" for electronic

requests to refill prescriptions.  This process was not automatic as required by the Stage

2 Meaningful Use criteria because it required users to manually review formularies on a

per-patient basis and because ECW acknowledged there were at least two instances

where ECW's software could not perform an eligibility check.  The pamphlet also

acknowledged that users were required to "[m]anually verify Rx eligibility for same-

day appointments and Telephone Refill requests" and to "[s]et up a scheduled job to

verify Rx eligibility for all scheduled appointments."  Because ECW required its users to

take these steps to verify Rx eligibility, its software did not automatically and

electronically check whether a drug formulary or preferred drug list exists for a given

patient.

60.     Moreover, ECW's software did not always accurately perform formulary

checks.  For example, ECW admitted in a patient safety advisory notice dated October

31, 2016 that its formulary check displayed incorrect values for orders of the drugs

Azithromycin, Zithromax, and Z-Pak, and that reliance on the values provided by

ECW's formulary check "can lead to the pharmacy dispensing extra or inaccurate

quantities."  In light of this deficiency, ECW recommended that its users "check the

dispense value of these medications and manually change the values as needed."

### 3.     ECW's Software Failed to Satisfy the Meaningful Use Certification Criteria Relating to Patient Educational Materials.

61.     The Stage 1 and Stage 2 Meaningful Use certification criteria also required

certified EHR technology to, among other things, electronically identify for a user

patient-specific education resources based on data included in the patient's problem

list, medication list, and laboratory tests and values/results. *See* 45 C.F.R. § 170.302(m) (July 28, 2010); 45 C.F.R. § 170.314(a)(15). Under Stage 2, laboratory tests and values/results must be received and transmitted in accordance with the Logical Observation Identifiers Names and Codes (LOINC) standard. *See* 45 C.F.R. §§ 170.207(c)(2), 170.314(a)(5), 170.314(a)(6).

62.     In July 2017, ECW published a notice that presented, in ECW's words, "a compilation of issues identified within eClinicalWorks that could present an EHR certification issue." This notice admitted:

  a.      "Rx Education materials printed from the Treatment window or Common Send button in the browser instance do not display in the Patient Logs," which affects "Meaningful Use Objective Measure 6." "Measure 6" is a reference to the requirement of identifying patient specific education materials.

  b.      "Patient Education printed or published in the Treatment window in the browser instance does not display in the Patient Education Logs," which "affects Meaningful Use Objective Measure 6."

63.     Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, between 2014 and at least as late as November 9, 2016, ECW did not always retrieve or transmit laboratory tests and values/results in accordance with the LOINC standard, as required by the Stage 2 certification criteria. ECW was aware that it did not meet this standard, as demonstrated by the following allegations, set forth in the Department of Justice's Complaint against ECW:

a.      In February 2014, an ECW employee inquired whether he should contact ECW's certification body and ask if ECW would "be able to meet the certification criteria" if a patient education vendor did not use LOINC codes.  In response, another ECW employee confirmed that ECW did not transmit LOINC codes.

b.      On November 9, 2016, ECW disclosed to the Department of Health and Human Services that, with respect to a patient education vendor, ECW "retrieved patient education materials for labs using lab names rather than LOINC codes."

64.      Because ECW's software failed to consistently or reliably enable users to identify patient-specific education resources and did not use the required LOINC standard when transmitting and/or receiving certain laboratory tests and values/results, ECW's software did not meet the applicable Meaningful Use criteria.

**4.      ECW's Software Failed to Satisfy the Meaningful Use Certification Criteria Requiring EHR Technology to Specify Medical Conditions on a Patient's Problem List Using the Required Systematized Nomenclature of Medicine – Clinical Terminology.**

65.      The Stage 2 Meaningful Use certification criteria also required certified EHR technology to, among other things, use the Systematized Nomenclature of Medicine – Clinical Terminology (SNOMED-CT) to specify the medical conditions on a patient's problem list.  *See* 45 C.F.R. §§ 170.207(a)(3), 170.314(a)(5).  The Stage 2 Meaningful Use certification criteria also required certified EHR technology to electronically incorporate data concerning a patient's problems contained in a transition

of care/referral summary according to the SNOMED-CT standard. *See* 45 C.F.R. §§ 170.207(a)(3), 170.314(b)(iii)(B)(1).

66. Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, SNOMED-CT is recognized internationally and is available at no cost through the National Library of Medicine. Using SNOMED-CT enables providers and electronic medical records to communicate in a common language, thus increasing the quality of patient care across many different provider specialties.

67. Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, ECW knew that its software did not satisfy this requirement, since on January 4, 2017, ECW informed the Department of Health and Human Services that its product did not transmit SNOMED codes in "certain, specific scenarios."

68. ECW admitted in a January 27, 2017 notice from ECW to its customers: "for the Health Information Exchange core measure, prior to September 22, 2016, eClinicalWorks restricted inclusion of SNOMED codes only to instances in which a precise ICD-10 code match existed for purposes of patient safety. Over the course of 2016, we have also enhanced the logic to support additional mappings. This change did not affect customers using IMO [(Intelligent Medical Objects)]. If you were a customer using IMO prior to October 3, 2016, please contact eClinicalWorks directly. . . . eClinicalworks requested confirmation from CMS that it was proper to give its customers numerator credit for the . . . Health Information Exchange core measure[]

notwithstanding the aforementioned distinctions.  CMS responded to eClinicalWorks

on January 20, 2017, and informed eClinicalWorks that it is not proper to give

customers numerator credit for [the Health Information Exchange core measure] for the

applicable time periods in which these distinctions existed."

69.     Upon information and belief, and as set forth in the Department of

Justice's Complaint against ECW, because ECW's software did not use SNOMED codes

when it was required to do so, ECW's software did not satisfy the Meaningful Use

criteria requiring the use of SNOMED codes to specify the medical conditions on a

patient's problem list.

**5.      ECW's Software Failed to Satisfy the Meaningful Use
Certification Criteria Requiring EHR Technology to Enable a
User to Electronically Create a Set of Export Summaries.**

70.     The Stage 2 Meaningful Use certification criteria required certified EHR

technology to "[e]nable a user to electronically create a set of export summaries for all

patients in EHR technology formatted according to the standard adopted at §

170.205(a)(3) that represents the most current clinical information about each patient ...."

45 C.F.R. § 170.314(b)(7).

71.     In addition to generating a set of export summaries, a certified EHR

technology must permit batch export of these summaries in a single export action. On

December 14, 2012, the Government published its "2014 Edition Test Procedure for

§170.314(b)(7) Data Portability, Approved Test Procedure Version 1.2."  That guidance

provided: "This test evaluates the ability for EHR technology to create a set of export

summaries (according to Consolidated CDA format) for all patients (for example, a batch export) contained within the EHR technology . . . ."

72.     Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, ECW's software did not satisfy these batch export requirements between 2014 and sometime after the spring of 2015.

73.     Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, ECW knew for many years that its software did not satisfy these batch export requirements, as demonstrated by the following allegations, set forth in the Department of Justice's Complaint against ECW:

    a.     In 2014, one or more users complained to ECW that its software did not permit a batch export.  In connection with ECW's assessment of these complaints, an ECW employee internally confirmed that he did not believe ECW "does a 'batch' process," and that he did not think ECW wanted "to make it easy to extract tons of patient data."

    b.     In December 2014, an ECW user reminded ECW of prior conversations addressing the batch export requirements and that he expected ECW to have "figured out a workable solution to this in the past 6 months given the advance warning."

    c.     In spring 2015, ECW's certification body concluded that ECW was noncompliant with the data portability requirements.

74.     ECW's CEO Girish Navani admitted in a letter to its customers dated June 1, 2017 that there was a "non-conformity" with ECW's software concerning the data

portability requirements of the Meaningful Use criteria, and stated that ECW "resolved the non-conformity in 2015" after ECW's certification body identified the issue.  In other words, ECW's software did not satisfy the data portability requirements of the Meaningful Use criteria between 2014 and sometime after the spring of 2015.

**6.      ECW's Software Failed to Satisfy the Meaningful Use Certification Criteria Requiring EHR Technology to Record User Actions in an Audit Log.**

75.      The Stage 1 and Stage 2 Meaningful Use certification criteria required certified EHR software to reliably and accurately record user actions in an audit log.  *See* 45 C.F.R. §170.302(r) (July 28, 2010); 45 C.F.R. § 170.314(d)(2)-(3).  Audit logs track user activity in an EHR and provide a chronology of a patient's care.  As the name suggests, audit logs can be used to verify an attesting healthcare provider's claims when they are subjected to audits by the Meaningful Use program.

76.      Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, ECW represented to its certification body that it satisfied this audit log requirement and also represented that "audit logs are also generated for all system adds/deletes/changes to patient records."

77.      However, upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, ECW's audit logs did not accurately record ECW's user actions, and in certain cases, the audit logs misled users as to events that were conducted in the course of a patient's treatment.  For example, in 2009, ECW acknowledged that its audit logs incorrectly reflected that diagnostic imaging orders were created, when they were only modified.

78.     Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, ECW's audit logs also failed to consistently and reliably track deletions of certain medical orders. In July 2012, ECW acknowledged that its audit logs did not accurately record diagnostic imaging orders.  Again, in June 2013, ECW knew that its audit logs were not showing the names of diagnostic imaging orders or the details of what was ordered.

**7.      ECW's Software Failed to Satisfy the Meaningful Use Certification Criteria Requiring EHR Technology to Reliably Record Diagnostic Imaging Orders.**

79.     The Stage 1 and Stage 2 Meaningful Use certification criteria required certified EHR software to provide computerized provider order entry, which requires users to be able to electronically record, store, retrieve, and modify laboratory and radiology/imaging orders.  *See* 45 C.F.R. §170.302(a) (July 28, 2010); 45 C.F.R. §170.314(a)(1).

80.     Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, in ECW's EHR system, diagnostic imaging orders that were not "linked" to an assessment sometimes failed to display in certain sections of the EHR that providers may rely on to place or follow up on such orders. Although diagnostic imaging orders that were not linked to an assessment may continue to be displayed in the progress note, they would not appear in these other sections.

81.     Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, in particular scenarios, ECW's software would

represent deleted diagnostic imaging orders as current by displaying the order in the progress note even after it had been deleted.

82.     On November 4, 2016, ECW notified its users in a Patient Safety Advisory as to additional issues with its laboratory and radiology/imaging functionalities.

83.     Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, because ECW's software did not always reliably retrieve and record diagnostic imaging orders in certain scenarios, the software did not satisfy the certification criteria requiring EHR software to provide computerized provider order entries.

**8.      ECW's Software Failed to Satisfy the Meaningful Use Certification Criteria Requiring EHR Technology to Reliably Perform Drug-Drug and Drug-Allergy Checks.**

84.     The Stage 1 and Stage 2 Meaningful Use certification criteria required certified EHR software reliably perform drug-drug and drug-allergy checks in an accurate and safe manner.  *See* 45 C.F.R. § 170.302(a) (July 28, 2010); 45 C.F.R. § 170.314(a)(2).

85.     Upon information and belief, and as set forth in the Department of Justice's Complaint against ECW, in particular scenarios, ECW's software did not reliably perform drug interaction checks.  Prescriptions that are modified by a doctor to suit a particular patient's needs are referred to as custom drugs.  In March 2016, ECW warned its customers that "any change to a custom strength, custom formulation, etc. will strip the NDC code from the medication and cause interaction checking not to fire."

86.     ECW also acknowledged that certain information displayed in connection with some drug interaction checks was inaccurate.  For example, in July 2017, ECW admitted: "In the browser instance of V10-SP2, the Issue Date listed on the Drug Interaction window displays as October 3, 2012 instead of the most recent Medi-Span drug database or Multum drug database Issue Date."  The notice acknowledged that this problem "could present an EHR certification issue."

87.     Because of these issues, ECW's software did not satisfy the certification criteria requiring EHR software to reliably perform drug-drug and drug-allergy checks in an accurate and safe manner.

### 9.     ECW's Software Failed to Consistently Record and Display Which Users Made Modifications to Patient Records.

88.     The Stage 1 and Stage 2 Meaningful Use certification criteria required certified EHR software to enable users to access patient problem lists and electronic notes.  *See* 45 C.F.R. § 170.302(c) (July 28, 2010); 45 C.F.R. § 170.314(a)(5), (9).  The Stage 1 and Stage 2 criteria also required EHR to verify and record what users made modifications to a patient's records.  *See, e.g.*, 45 C.F.R. § 170.302(o), (r), (t) (July 28, 2010); 45 C.F.R. § 170.314(d).

89.     In July 2017, ECW published a notice that presented, in ECW's words, "a compilation of issues identified within eClinicalWorks that could present an EHR certification issue."  This notice admitted that "[i]n some instances, the *Modified By* field on the Problem list may display as blank.  This issue occurs randomly and does not affect every instance."  The notice also admitted that "[i]n some instances, when

defaults are merged in the Progress Note section (e.g., Examination, Procedures, etc.)

the Username field in the Access Logs may display as blank.  This issue occurs in the

following three sections of the Progress Notes: - Examination[,] - Procedure[,] - Review

of Systems (ROS)."

90.     Because ECW's software did not reliably record or display the identities of

users who had made modifications to patient records, it did not satisfy the

requirements cited above.  The failure to maintain accurate records of the persons

modifying health records also implicates the audit log requirements discussed in

Section III.E.6 above.

**10.    ECW's Software Failed to Reliably or Accurately Record the Social History of Patients.**

91.     The Stage 1 and Stage 2 Meaningful Use certification criteria required

certified EHR software to enable users to record information about a patient's social

history, such as their history of tobacco use.  *See, e.g.*, 45 C.F.R. § 170.302(g) (July 28,

2010); 45 C.F.R. § 170.314(a)(5).  A certified EHR must be able to use this data to make

calculations for submissions to the Meaningful Use program.  *See* 45 C.F.R. § 170.314(c).

92.     In July 2017, ECW published a notice that presented, in ECW's words, "a

compilation of issues identified within eClinicalWorks that could present an EHR

certification issue."  This notice admitted that "[i]n some instances, social history

structured data entries in the Progress Notes do not update in the *struct social* history

table within the application on the back end (not visible to end users).  This table is used

for calculating social history measures for incentive programs."

93.     Because ECW's software did not enable users to reliably or accurately record the social history of their patients, ECW's software did not satisfy the Meaningful Use criteria relating to information about social history.

**F.    ECW's False Statements and Broken Promises Concerning Its Software's Satisfaction of Meaningful Use Criteria Injured Plaintiffs and the Proposed Class and Subclasses.**

94.     ECW's current and former customers, including Plaintiffs, were injured insofar as ECW's misrepresentations concerning its software's satisfaction of the certification criteria of the Meaningful Use program caused or contributed to them paying inflated prices for ECW's software and services, or caused or contributed to them selecting ECW as their EHR vendor instead of other competing EHR vendors.

95.     ECW's current and former customers, including Plaintiffs, were injured insofar as ECW promised that ECW's software would satisfy all of the certification criteria of the Meaningful Use program, but received software that did not satisfy many such criteria.  As a result, the software was less valuable, less functional, and more burdensome than ECW promised it would be.

96.     ECW's current and former customers, including Plaintiffs, were injured insofar as deficiencies in ECW's software introduced new risks of errors in the process of treating patients or prescribing medication.

97.     ECW's current and former customers, including Plaintiffs, were injured insofar as deficiencies in ECW's software increased the risk of the Government refusing to provide incentive payments or of the Government seeking to recoup incentive payments.

**IV.    ALLEGATIONS SPECIFIC TO THE NAMED PLAINTIFFS**

    **A.    The Carrollton Family Clinic**

        **1.    The Carrollton Family Clinic's Contract with ECW.**

98.    CFC and ECW executed a written agreement on December 16, 2014.  A true and correct copy of this agreement is attached hereto as Exhibit 1.  ECW's written agreement with CFC contains a document titled "Exhibit B – Terms and Conditions." ECW drafted this agreement and presented it to CFC on a take-it-or-leave-it basis. There was no negotiation over the terms.

99.    ECW employee Bryan Razzano prepared the agreement described in the prior paragraph, and signed the agreement on behalf of ECW.  Upon information and belief, Mr. Razzano prepared the agreement in Massachusetts.

100.    The initial term of CFC's contract with ECW was sixty months.

101.    The "Terms and Conditions" in ECW's contracts with CFC include the following provisions:

    a.    "eClinicalWorks represents and warrants that the eClinicalWorks Products will meet the 'Meaningful Use' certification criteria as defined by the American Recovery and Reinvestment Act (ARRA). If eClinicalWorks Products do not get certified or fails [sic] to meet the certification criteria eClinicalWorks will credit twelve (12) months of maintenance fees."  Ex. 1, at § 5(i);

    b.    "eClinicalWorks represents and warrants that eClinicalWorks will update Products (including, but not limited to, content usage for drug database and drug interaction checks, E&M Coding Advisor) as necessary to ensure that

such product complies with the most current federal or state requirements." Ex.

1, at § 5(c).

    c.    "This Agreement, its validity, construction, and effect shall be

governed by the laws of the Commonwealth of Massachusetts." Ex. 1, at § 7(f).

    **2.**    **The Carrollton Family Clinic's Reliance on ECW's False and Misleading Statements.**

102.    In deciding to use ECW's software, to contract with ECW, and to make

payments to ECW, CFC relied on ECW's receipt of certifications from accredited

certification bodies as an assurance that ECW's software satisfied the certification

criteria of the Meaningful Use program.  ECW gave CFC no reason to suspect that ECW

had made false statements to obtain its certifications.

103.    In deciding to use ECW's software, to contract with ECW, and to make

payments to ECW, CFC relied on statements by ECW that stated in sum or substance

that ECW's software satisfied the certification criteria of the Meaningful Use program.

104.    ECW regularly sent CFC written guidance assuring CFC that ECW's

software satisfied the certification criteria of the Meaningful Use program and could be

used to successfully attest for a Meaningful Use incentive payment.  This written

guidance did not disclose that ECW's software failed to satisfy the requirements of the

Meaningful Use program.  CFC relied on this written guidance in making its decisions

to use ECW's software and to make payments to ECW under the contract.

105.     Had CFC known that ECW's software did not in fact satisfy the

requirements of the Meaningful Use program, it would not have contracted with ECW

and would not have made payments to ECW under the contract.

106.     Upon information and belief, the software ECW provided to CFC

pursuant to the Clinic's contract suffered from the defects identified in Section III.E

above.

107.     In 2017, CFC planned to apply for a Meaningful Use incentive payment

based on its use of ECW, but was informed by a representative of the Mississippi

Division of Medicaid that ECW would not enable her to attest to the meaningful use of

certified EHR software because ECW did not perform formulary checks itself and

required CFC to go through a separate process to verify those checks.  *See* Section III.E.2

(describing this deficiency).

**B.**     **Dr. Perrin Curran**

**1.**     **Dr. Curran and Primary Health Partners' Contracts with ECW**

108.     Dr. Curran and his partners in Primary Health Partners have had written

contracts with ECW since at least as early as 2005.

109.     In November 2009, Primary Health Partners entered into a new contract

with ECW, a true and correct copy of which is attached hereto as Exhibit 2.  The

agreement became effective November 1, 2009.  ECW drafted this agreement and

presented it to Primary Health Partners on a take-it-or-leave-it basis.  There was no

negotiation over the terms.

110.    ECW employee Melissa Andrade signed the agreement described in the paragraph above on behalf of ECW.  Upon information and belief, Ms. Andrade prepared the agreement in Massachusetts.

111.    The November 2009 contract provided a license to use the most up-to-date version of ECW's software for each of the partners in Primary Health Partners, including one for Dr. Curran.

112.    In October 2013, ECW and Primary Health Partners entered into an addendum that became effective October 29, 2013.  This addendum governed the parties' obligations with respect to ECW's cloud services, but did not supersede the terms governing ECW's prior agreement to provide other services and software.

113.    ECW's contracts with Primary Health Partners were renewed on an annual basis between 2005 and the present.

114.    Between 2005 and the present, the partners in Primary Health Partners have had an arrangement whereby the partners share the costs of the payments Primary Health Partners paid to ECW pursuant to these contracts, and the partners would each receive a license to use ECW's software as well as other benefits procured by Primary Health Partners' contract with ECW.  Dr. Curran has always paid his share of Primary Health Partners' payments to ECW.

115.    Dr. Curran and Primary Health Partners' contract with ECW includes the following provisions:

    a.    "eClinicalWorks represents and warrants that eClinicalWorks will update Products (including, but not limited to, content usage for drug database

and drug interaction checks, E&M Coding Advisor) as necessary to ensure that such Product complies with the most current federal or state requirements." Ex. 2, at § 5.3.

b.   "This Agreement, its validity, construction, and effect shall be governed by the laws of the Commonwealth of Massachusetts." Ex. 2, § 7.6.

**2.   Dr. Curran's Reliance on ECW's False and Misleading Statements.**

116.   In deciding to use ECW's software, to continue to renew their license, to enter into further contracts with ECW, and to make payments to ECW, Dr. Curran and Primary Health Partners relied on ECW's receipt of certifications from accredited certification bodies as an assurance that ECW's software satisfied the certification criteria of the Meaningful Use program.

117.   In deciding to use ECW's software, to continue to renew their license, to enter into further contracts with ECW, and to make payments to ECW, Dr. Curran and Primary Health Partners relied on numerous public statements by ECW in its marketing materials that stated, in sum or substance, that ECW's software satisfied the certification criteria of the Meaningful Use program.

118.   In 2011, Dr. Curran received written guidance from ECW purporting to set forth the steps he would need to take to successfully attest for a Meaningful Use incentive payment using ECW's software. This guidance did not disclose that ECW's software in fact failed to satisfy the requirements of the Meaningful Use program. Dr. Curran relied on this written guidance.

119.    Between October 2 and 4, 2011, ECW hosted a national user conference at Scottsdale, Arizona.  According to ECW's CEO Girish Navani, the event "focused on the theme Improving Healthcare Together™, showcasing innovations that aid in improving care and organizations that exemplify improving quality, whether through demonstrating meaningful use, becoming a Patient-centered Medical Home or Accountable Care Organization, receiving a Davies award or showing improved workflow in their practice."  Dr. Curran attended this event.  During the event, various ECW presenters encouraged Dr. Curran to use ECW's software to attest for a Meaningful Use incentive payment, and provided guidance as to how to successfully obtain Meaningful Use incentive payments based on the use of ECW's software.  During the conference, ECW did not disclose that ECW's software in fact failed to satisfy the requirements of the Meaningful Use program.  Dr. Curran relied on the statements made by ECW during this conference.

120.    In February 2012, Dr. Curran submitted an attestation of Meaningful Use based on his use of version 9 of ECW's software.  The reporting period for this attestation was September 1, 2011 through December 26, 2011.  Dr. Curran received an $18,000 incentive payment based on this attestation.

121.    Between October 11 and 14, 2013, ECW hosted a national user conference at San Antonio, Texas.  Dr. Curran attended this event.  During the event, ECW presenters encouraged Dr. Curran to use ECW's software to attest for a Meaningful Use incentive payment, and provided guidance as to how to successfully obtain Meaningful Use incentive payments based on the use of ECW's software.  During the conference,

ECW did not disclose that ECW's software in fact failed to satisfy the requirements of the Meaningful Use program.  Dr. Curran relied on the statements made by ECW during this conference.

122.    Had Dr. Curran and Primary Health Partners known that ECW's software did not in fact satisfy the requirements of the Meaningful Use program, they would not have renewed their contracts with ECW, would not have entered into further contracts with ECW, and would not have made payments to ECW under their contracts.

123.    Upon information and belief, the software ECW provided to Primary Health Partners pursuant to its contract suffered from the defects identified in Section III.E above.

124.    In fall 2015, Dr. Curran's 2011 attestation for a Meaningful Use incentive payment was audited by the Government.  When Dr. Curran attempted to generate an audit log to verify certain information in his 2011 attestation, ECW's software would not generate an audit log.  He asked ECW's employees to assist with generating an audit log multiple times, but ECW's employees were unable to do so.  As a result of the software's failure to generate an audit log, Dr. Curran failed his audit and the Government required him to return $18,000.  *See* Section III.E.6 above (describing ECW's failure to generate audit logs).

### 3.    Primary Health Partners Assignment of Claims to Dr. Curran.

125.    In 2017, Primary Health Partners agreed to assign and transfer to Dr. Curran all of its rights, title, and interest in any legal, equitable, and statutory claims, demands, or causes of action it may have against eClinicalWorks under the laws of the

United States of America or any State thereof.  The written agreement setting forth this assignment is attached hereto as Exhibit 3.

## V.   CLASS ALLEGATIONS

### A.   The Proposed Class and Subclasses.

126.   Plaintiffs propose a class consisting of all people or entities who paid money to ECW to purchase, license, or otherwise use ECW's software between January 14, 2010 and May 30, 2017.  Plaintiffs will refer to this proposed class as "the Proposed Class."

127.   Plaintiffs propose a subclass consisting of all healthcare providers who entered into or renewed written contracts with ECW between January 14, 2010 and May 30, 2017, and whose contracts contain a provision which states in sum and substance: "eClinicalWorks represents and warrants that the eClinicalWorks Products will meet the 'Meaningful Use' certification criteria as defined by the American Recovery and Reinvestment Act (ARRA). If eClinicalWorks Products do not get certified or fails [sic] to meet the certification criteria eClinicalWorks will credit twelve (12) months of maintenance fees."  Plaintiffs will refer to this subclass as the "Credit Provision Subclass."

128.   Plaintiffs propose another subclass consisting of all healthcare providers who entered into or renewed written contracts with ECW between January 14, 2010 and May 30, 2017, and whose contracts contain a provision which states in sum and substance: "eClinicalWorks represents and warrants that eClinicalWorks will update Products (including, but not limited to, content usage for drug database and drug

interaction checks, E&M Coding Advisor) as necessary to ensure that such product complies with the most current federal or state requirements."  Plaintiffs will refer to this subclass as the "Compliance Provision Subclass."

129.     Excluded from any of the above proposed class definitions are:

a.       Any executive, officer, employee, consultant, or agent of ECW;

b.       ECW and any entities in which ECW has a controlling interest, or which have a controlling interest in ECW;

c.       Any entities in which ECW's officers, directors, or employees are employed;

d.       Any of the legal representatives, heirs, successors, or assigns of ECW;

e.       The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

f.       Any of ECW's outside counsel and their immediate family.

**B.      The Proposed Class and Subclasses Are So Numerous that Individual Joinder Is Impractical.**

130.     ECW claims that over 130,000 physicians and nurse practitioners use ECW's software.

131.     ECW claims that over 80,000 facilities run ECW's software.

132.     Upon information and belief, there are thousands or tens of thousands of members of the Proposed Class and each of the proposed Subclasses.

**C.      Answering Questions Common to the Proposed Class and Subclasses Will Drive the Resolution of this Litigation, and Common Questions Predominate over Individual Questions.**

133.     The answers to common questions will determine ECW's liability to all (or nearly all) Class Members.  Common questions to the Proposed Class and Subclasses include:

a.      Whether ECW made the representations, guarantees, and promises set forth above and substantially similar representations to Plaintiffs and members of the Proposed Class and Subclasses;

b.      Whether ECW failed to disclose material information by withholding the truth about its software's failure to satisfy the requirements of the Meaningful Use program;

c.      Whether ECW's representations to Plaintiffs and the Proposed Class and Subclasses were false, misleading or unfair;

d.      Whether ECW owed duties to Plaintiffs and the Proposed Class and Subclasses, the scope of those duties and if it breached those duties;

e.      Whether ECW breached the implied covenant of good faith and fair dealing by failing to disclose to Plaintiffs and the Proposed Class that its software did not satisfy the requirements of the Meaningful Use program;

f.      Whether ECW fraudulently induced Plaintiffs and the Proposed Class and Subclasses into purchasing, licensing, or otherwise using their software under false pretenses, through material misrepresentations or material omissions;

g.      Whether ECW's software "fail[ed] to meet the certification criteria" of the Meaningful Use program, thereby obligating ECW to "credit twelve (12) months of maintenance fees" to all members of the Credit Provision Subclass;

h.      Whether ECW was unjustly enriched by its receipt and retention of maintenance fees paid by the Credit Provision Subclass during any time period that ECW's software failed to satisfy the certification criteria of the Meaningful Use program;

i.      Whether ECW breached its obligation to the Compliance Provision Subclass to update its software "as necessary to ensure that such product complies with the most current federal or state requirements";

j.      Whether certain provisions in ECW's written contracts, including boilerplate provisions that ECW claims limit its liability or require Plaintiffs to submit their claims to binding arbitration, mean what ECW claims they mean; and

k.      Whether those same provisions referred to in the prior subparagraph are unconscionable, illusory, fraudulent, violative of public policy, or otherwise invalid, void, or voidable.

134.    No variation in ECW's contracts with its customers will undermine the predominance of common issues to the claims of the Proposed Class and Subclasses.

a.      The Proposed Class's claims will include claims sounding in fraud and breach of the implied covenant of good faith and fair dealing, which is implied in every contract. *See* Section VII below. Liability for extra-contractual

misrepresentations or for bad faith will not be affected by any variation in the terms of the contracts, and any provision waiving or limiting liability under these theories will be unenforceable because they violate public policy.

b.      The Proposed Subclasses are defined to include only persons with contracts containing provisions establishing duties to provide software that satisfied the requirements of the Meaningful Use program and to provide software updates to ensure continued compliance with those requirements. Insofar as people have contracts with ECW that do not include these provisions, they will not be members of these Subclasses.

c.      Upon information and belief, many of ECW's contracts with its customers will contain Massachusetts choice-of-law provisions like the provisions in the Plaintiffs' contracts with ECW.  Moreover, there is no reason to believe that the applicable state law of contracts will vary meaningfully as applied to the contractual issues presented by this case.  In any event, the Proposed Class and Subclasses could be divided based on the applicable laws if the Court later decides that the applicable laws meaningfully vary across different groups of contracts.

**D.**      **Plaintiffs' Claims Are Typical of the Claims of All Class Members.**

135.    Plaintiffs are members of the Proposed Class because they paid money to ECW to purchase, license, or otherwise use ECW's software between January 14, 2010 and May 30, 2017.

136.     CFC is a member of the Credit Provision Subclass because its written contract with ECW states: "eClinicalWorks represents and warrants that the eClinicalWorks Products will meet the 'Meaningful Use' certification criteria as defined by the American Recovery and Reinvestment Act (ARRA). If eClinicalWorks Products do not get certified or fails [sic] to meet the certification criteria eClinicalWorks will credit twelve (12) months of maintenance fees."

137.     Plaintiffs are members of the Compliance Provision Subclass because their contracts with ECW state: "eClinicalWorks represents and warrants that eClinicalWorks will update Products (including, but not limited to, content usage for drug database and drug interaction checks, E&M Coding Advisor) as necessary to ensure that such product complies with the most current federal or state requirements."

**E.**     **Plaintiffs and Their Counsel Will Adequately Represent the Proposed Class.**

138.     Plaintiffs will put the interests of the Class Members on equal footing with their own interests.

139.     Plaintiffs' counsel are highly experienced class action litigators who are well-prepared to represent the interests of the Class Members.

**F.**     **A Class Action Is Superior to Individual Actions.**

140.     ECW is a sophisticated party with substantial resources.

141.     Prosecution of this litigation is likely to be expensive.  If litigated in individual proceedings, the damages suffered by the members of the Proposed Class and Subclasses may not be large enough to offset the costs of litigation.

142.     Litigating common issues through a class action is likely more efficient than litigating multiple disputes involving the same questions separately.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

143.     The statute of limitations is tolled because, for the reasons discussed above, ECW fraudulently concealed its software's failure to satisfy the requirements of the Meaningful Use program.

144.     The statute of limitations is tolled because, for the reasons discussed above, ECW's fraud was ongoing until at least as late as May 30, 2017, and the continuing violations doctrine therefore applies.

145.     The statute of limitations is tolled because, for the reasons discussed above, ECW's breaches of contract are ongoing because it continues to retain payments, including maintenance fees, that it did not earn due to its failure to perform its contractual obligations.

146.     The statute of limitations is tolled because, for the reasons discussed above, ECW's unjust enrichment is ongoing because it continues to retain payments, including maintenance fees, that it did not earn due to its failure to perform its contractual obligations.

147.     The statute of limitations is tolled because the discovery rule tolls the statute of limitations.  Due to the highly technical nature of the defects in ECW's software and ECW's efforts to conceal those defects, health care providers like Plaintiffs could not have identified the many defects that give rise to their claims until after ECW's settlement with the Government was announced on May 30, 2017.

148.    The statute of limitations is tolled based on principles of equitable tolling because ECW has affirmatively misled Plaintiffs, and Plaintiffs have made efforts to resolve their dispute with ECW before filing suit.

**VII.    CLAIMS FOR RELIEF**

**COUNT I—VIOLATION OF MASSACHUSETTS CHAPTER 93A, SECTION 11 (ON BEHALF OF PLAINTIFFS AND THE PROPOSED CLASS AGAINST ECW)**

149.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

150.    Plaintiffs and the Proposed Class are persons engaged in the conduct of trade or commerce.

151.    ECW engaged in deceptive acts by, for example, (1) falsely stating to Plaintiffs and the Proposed Class that its software currently satisfied the certification criteria of the Meaningful Use program, (2) falsely guaranteeing to Plaintiffs and the Proposed Class that ECW would update its software to comply with the certification criteria of the Meaningful Use program, (3) making false statements to its accredited certification body in order to fraudulently obtain an unearned certification of compliance with the criteria of the Meaningful Use program, and (4) concealing from Plaintiffs and the Proposed Class the truth about its software's failure to satisfy the certification criteria of the Meaningful Use program.

152.    ECW's deceptive trade practices caused Plaintiffs and the Proposed Class to suffer a loss of money or property by, for example, (1) causing Plaintiffs and the Proposed Class to pay inflated prices for ECW's product, (2) causing or contributing to

Plaintiffs' and the Proposed Class's decision to contract with ECW instead of one of its competitors, (3) causing or contributing to Plaintiffs' and the Proposed Class's decision to renew contracts with ECW instead of one of its competitors, (4) causing Dr. Curran and others similarly situated to forfeit a Meaningful Use payment, (5) causing CFC and others similarly situated to be unable to attest to meaningful use of certified EHR technology and thereby miss the opportunity to obtain a Meaningful Use payment, and (6) causing Plaintiffs and the Proposed Class to expend out-of-pocket expenses, time, and other resources to cure or cope with the many deficiencies in ECW's software.

153.    Upon information and belief, ECW's deceptive trade practices occurred primarily and substantially within Massachusetts because, for example, (1) ECW is headquartered in Massachusetts and most of its employees work there, (2) ECW's decisions that led to its software's failure to satisfy Meaningful Use criteria were made in Massachusetts, (3) ECW's decisions that led ECW to make false statements about its software's satisfaction of Meaningful Use criteria were made in Massachusetts, (4) ECW's decisions to conceal the truth about its software's failure to satisfy Meaningful Use criteria were made in Massachusetts, and (5) ECW included Massachusetts choice-of-law clauses in its contracts with Plaintiffs.

### COUNT II—FRAUD AND MISREPRESENTATION
### (ON BEHALF OF PLAINTIFFS AND THE PROPOSED CLASS AGAINST ECW)

154.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

155.    ECW made material representations that were false.  ECW knew its statements were false or was reckless as to their veracity, and made its statements to induce Plaintiffs and the Proposed Class to act upon them.

156.    Specifically, ECW misrepresentations included, for example, (1) falsely stating to Plaintiffs and the Proposed Class that its software currently satisfied the certification criteria of the Meaningful Use program, (2) falsely guaranteeing to Plaintiffs and the Proposed Class that ECW would update its software to comply with the certification criteria of the Meaningful Use program, (3) making false statements to its accredited certification body in order to fraudulently obtain an unearned certification of compliance with the criteria of the Meaningful Use program, and (4) concealing from Plaintiffs and the Proposed Class the truth about its software's failure to satisfy the certification criteria of the Meaningful Use program.

157.    Plaintiffs and the Proposed Class acted in reliance on the false, material representations and omissions made by ECW, which caused them injury.

158.    If Plaintiff and the Proposed Class had known that ECW's software did not and would not satisfy the certification criteria of the Meaningful Use program, they (1) would not have contracted with ECW, (2) would not have renewed their contracts with ECW, and/or (3) would have paid less to purchase, license or use the software.

159.    ECW was aware that its software's failure to satisfy the certification criteria of the Meaningful Use program was a material fact in inducing Plaintiffs and the Proposed Class to give money in exchange for services and/or software.

160.    As a result of ECW's fraudulent representations and fraudulent omissions, Plaintiffs and the Proposed Class were induced into contracts that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

**COUNT III—NEGLIGENT MISREPRESENTATION**
**(ON BEHALF OF PLAINTIFFS AND THE PROPOSED CLASS AGAINST ECW)**

161.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

162.    ECW made false representations for the guidance of Plaintiffs and the Proposed Class in the course of its business.

163.    Specifically, ECW's misrepresentations included, for example, (1) falsely stating to Plaintiffs and the Proposed Class that its software currently satisfied the certification criteria of the Meaningful Use program, (2) falsely guaranteeing to Plaintiffs and the Proposed Class that ECW would update its software to comply with the certification criteria of the Meaningful Use program, (3) making false statements to its accredited certification body in order to fraudulently obtain an unearned certification of compliance with the criteria of the Meaningful Use program, and (4) concealing from Plaintiffs and the Proposed Class the truth about its software's failure to satisfy the certification criteria of the Meaningful Use program.

164.    ECW made these false statements without exercising reasonable care or competence in obtaining or communicating the information.

165.    Plaintiffs and the Proposed Class acted in reliance on the false, material representations and omissions made by ECW, which caused them injury.

166.    If Plaintiffs and the Proposed Class had known that ECW's software did not and would not satisfy the certification criteria of the Meaningful Use program, they (1) would not have contracted with ECW, (2) would not have renewed their contracts with ECW, and/or (3) would have paid less to purchase, license or use the software.

167.    As a result of ECW's misrepresentations and omissions, Plaintiffs and the Proposed Class were induced into contracts that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

## COUNT IV—BREACH OF THE IMPLIED
## COVENANT OF GOOD FAITH AND FAIR DEALING
## (ON BEHALF OF PLAINTIFFS AND THE PROPOSED CLASS AGAINST ECW)

168.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

169.    Plaintiffs and the Proposed Class entered into contracts with ECW by which ECW agreed to provide EHR software that satisfied and would continue to satisfy the certification criteria of the Meaningful Use program.

170.    The implied covenant of good faith and fair dealing was part of ECW's contracts with Plaintiffs and the Proposed Class.

171.    ECW breached the implied covenant of good faith and fair dealing by, for example, (1) falsely stating to Plaintiffs and the Proposed Class that its software currently satisfied the certification criteria of the Meaningful Use program, (2) falsely guaranteeing to Plaintiffs and the Proposed Class that ECW would update its software

to comply with the certification criteria of the Meaningful Use program, (3) making false statements to its accredited certification body in order to fraudulently obtain an unearned certification of compliance with the criteria of the Meaningful Use program, (4) concealing from Plaintiffs and the Proposed Class the truth about its software's failure to satisfy the certification criteria of the Meaningful Use program, (5) ignoring or disregarding customer complaints regarding non-compliant aspects of its software, (6) failing to timely or reasonably redress non-compliant aspects of its software, (7) encouraging Plaintiffs and the Proposed Class to attest for Meaningful Use incentive payments without informing them that ECW was not compliant with the certification criteria of the Meaningful Use program, and (8) failing to completely or timely disclose many of the problems with its software.

172.    ECW's breaches of the implied covenant of good faith and fair dealing damaged Plaintiffs and the Proposed Class as described above.

## COUNT V – UNJUST ENRICHMENT
## (ON BEHALF OF PLAINTIFFS AND THE PROPOSED CLASS AGAINST ECW)

173.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

174.    Pursuant to ECW's contracts with its customers, ECW charged Plaintiffs and the Proposed Class so-called "maintenance fees" as purported compensation for the performance of upgrades on ECW's software, including upgrades needed to ensure compliance with the certification criteria of the Meaningful Use program.

175.    Nonetheless, ECW failed to timely update its software to comply with the requirements of the Meaningful Use program, and concealed its failure to perform maintenance necessary to ensure its software's compliance with those requirements for many years.

176.    Through its unlawful conduct, including its false statements about its software's compliance and its concealment of deficiencies with its software, ECW knowingly received and retained wrongful benefits and funds from Plaintiffs.  ECW therefore acted with conscious disregard for Plaintiffs' rights.

177.    ECW has been unjustly enriched through its retention of the revenues derived from Plaintiffs' and the Proposed Class's payment of maintenance fees.  ECW's receipt and retention of maintenance fees that it did not earn and to which it had no contractual entitlement was unfair, unconscionable, oppressive, unjust and inequitable towards Plaintiffs and the Proposed Class, because ECW misrepresented the facts about its software's compliance with certification criteria of the Meaningful Use program.

178.    Plaintiffs and the Proposed Class were injured as a direct and proximate result of ECW's misrepresentations and omissions because they paid for maintenance fees to ECW in exchange for services that ECW did not provide.  Because ECW's retention of the benefit conferred on it by Plaintiffs and the Proposed Class is unjust and inequitable, ECW must pay restitution for its unjust enrichment.

## COUNT VI—BREACH OF WRITTEN CONTRACT
## (ON BEHALF OF PLAINTIFF CARROLTON FAMILY
## CLINIC AND THE CREDIT PROVISION SUBCLASS AGAINST ECW)

179.   CFC incorporates by reference the allegations contained in the preceding paragraphs.

180.   CFC and the Credit Provision Subclass entered into contracts with ECW stating, in sum or substance, that: "eClinicalWorks represents and warrants that the eClinicalWorks Products will meet the 'Meaningful Use' certification criteria as defined by the American Recovery and Reinvestment Act (ARRA). If eClinicalWorks Products do not get certified or fails [sic] to meet the certification criteria eClinicalWorks will credit twelve (12) months of maintenance fees."

181.   As explained in more detail above, ECW's software did not satisfy many certification criteria of the Meaningful Use program for many years.  For some criteria, ECW has admitted that its software was non-compliant.

182.   Despite the failure of ECW's software to satisfy the certification criteria of the Meaningful Use program, ECW has refused to provide any credit of maintenance fees to CFC.  Upon information and belief, ECW has not provided any credit of maintenance fees to other members of the Credit Provision Subclass.  ECW's refusal to provide credits of maintenance fees is a willful breach of the express requirements of its contracts with CFC, and the rest of the Credit Provision Subclass.

183.   CFC and the rest of the Credit Provision Subclass have been damaged by ECW's refusal to provide credits of maintenance fees.  Because ECW has not provided such credits, Plaintiffs have paid maintenance fees to ECW that it had no contractual

right to receive for many years.  For each year that ECW's software failed to satisfy any

certification of the Meaningful Use program, CFC's and the rest of the Credit Provision

Class's payment of maintenance fees are damages caused by ECW's breach.

## COUNT VII—UNJUST ENRICHMENT
### (ON BEHALF OF PLAINTIFF CARROLTON FAMILY
### CLINIC AND THE CREDIT PROVISION SUBCLASS AGAINST ECW)

184.    CFC incorporates by reference the allegations contained in the preceding

paragraphs.

185.    Pursuant to ECW's contracts with CFC and the Proposed Class, ECW

charged CFC and the Proposed Class so-called "maintenance fees" as purported

compensation for the performance of upgrades on ECW's software, including upgrades

to ensure compliance with the certification criteria of the Meaningful Use program.

186.    CFC and the Credit Provision Subclass conferred a benefit on ECW by

paying annual maintenance fees to ECW during the time period in which their contracts

were in effect.

187.    When ECW received maintenance fees from CFC and the Credit Provision

Subclass, ECW knew that its software failed to satisfy at least some Meaningful Use

certification criteria, and that its contracts with CFC and the Credit Provision Subclass

therefore required ECW to credit all maintenance fees for that year.

188.    Through its unlawful conduct, including its false statements about its

software's compliance and its concealment of deficiencies with its software, ECW

knowingly received and retained wrongful benefits and funds from Plaintiffs.  ECW

therefore acted with conscious disregard for Plaintiffs' rights.

189.    ECW has been unjustly enriched through its retention of the revenues

derived from CFC and the Credit Provision Subclass's payment of maintenance fees.

ECW's receipt and retention of maintenance fees that it did not earn and to which it had

no contractual entitlement was unfair, unconscionable, oppressive, unjust and

inequitable towards CFC and the Credit Provision Subclass, because ECW

misrepresented the facts about its software's compliance with certification criteria of the

Meaningful Use program.

190.    CFC and the Credit Provision Subclass were injured as a direct and

proximate result of ECW's misrepresentations and omissions because they paid for

maintenance fees to ECW that they had no contractual obligation to pay.  Because

ECW's retention of the benefits conferred on it by CFC and the Credit Provision

Subclass is unjust and inequitable, ECW must pay restitution for its unjust enrichment.

## COUNT VIII—BREACH OF WRITTEN CONTRACT
### (ON BEHALF OF PLAINTIFFS AND
### THE COMPLIANCE PROVISION SUBCLASS AGAINST ECW)

191.    Plaintiffs incorporate by reference the allegations contained in the

preceding paragraphs.

192.    Plaintiffs and the Compliance Provision Subclass entered into contracts

with ECW stating, in sum or substance, that:  "eClinicalWorks represents and warrants

that eClinicalWorks will update Products (including, but not limited to, content usage

for drug database and drug interaction checks, E&M Coding Advisor) as necessary to

ensure that such product complies with the most current federal or state requirements."

193.    As explained in more detail above, ECW's software did not satisfy many

certification criteria of the Meaningful Use program for many years.  For some criteria,

ECW has admitted that its software was non-compliant.  As such, ECW breached its

obligation to update its software as necessary to ensure that the software complied with

the most current requirements of the federal Meaningful Use program.

194.    ECW's breach damaged Plaintiffs and the Proposed Class as described

above.

## COUNT IX—DECLARATORY JUDGMENT
## UNDER 28 U.S.C. § 2201, ET SEQ. (DECLARATORY JUDGMENT ACT)
## (ON BEHALF OF PLAINTIFFS AND THE PROPOSED CLASSES AND
## SUBCLASSES AGAINST ECW)

195.    Plaintiffs incorporate by reference the allegations contained in the

preceding paragraphs.

196.    There is a real and actual controversy between Plaintiffs and ECW as to

the enforceability of certain provisions purporting to apply in the event of litigation

between the parties.

197.    Plaintiffs' contracts with ECW each contain a provision stating: "Dispute

Resolution. In the event of any dispute, the parties agree that the first recourse to

resolution shall be by arbitration, and that no action at law shall be taken by either party

previous to an unsuccessful resolution by arbitration. These provisions shall survive the

termination of this agreement, regardless, of the cause of such termination."  Ex. 1, §

7(g); Ex. 2, § 7.7.

198.    Plaintiffs' contracts with ECW each contain a provision stating:

"LIMITATION OF LIABILITY. ECLINICALWORKS' LIABILITY TO CUSTOMER FOR

ANY LOSSES OR INDIRECT DAMAGES, IN CONTRACT, TORT OR OTHERWISE,

ARISING OUT OF THE SUBJECT MATTER OF THIS AGREEMENT SHALL BE

LIMITED TO THOSE ACTUAL AND DIRECT DAMAGES WHICH ARE

REASONABLY INCURRED BY CUSTOMER AND SHALL NOT EXCEED THE FEES

PAID BY CUSTOMER WITH RESPECT TO THE SERVICES GIVING RISE TO THE

LIABILITY OVER THE MONTHS IN WHICH LIABILITY OCCURRED NOT TO

EXCEED TWELVE (12) MONTHS. ECLINICALWORKS WILL NOT BE LIABLE FOR:

(i) SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, EXEMPLARY OR

CONSEQUENTIAL DAMAGES OR LOSS OF DATA, LOST PROFITS, LOSS OF

GOODWILL IN ANY WAY ARISING FROM OR RELATING TO THIS AGREEMENT,

THE APPLICATIONS OR SERVICES, EVEN IF ECLINICALWORKS HAS BEEN

NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES OCCURRING." Ex. 1, § 5(e);

Ex. 2, § 5.5.

199.    ECW's contract with Plaintiff CFC contains a provision stating: "If

customer considers litigation as recourse for dispute resolution, customer will be

responsible for their own legal fees and expenses." Ex. 1, § 5(f).

200.    ECW's contract with Plaintiff Perrin Curran, M.D., states: "If the customer

considers litigation as recourse to dispute resolution, customer will be responsible for

all legal fees and expenses incurred by eClinicalWorks to defend or resolve the

dispute." Ex. 2, § 5.6.

201.    None of these provisions are enforceable.

202.    Each of these provisions is procedurally and substantively unconscionable, and is therefore void, invalid, or voidable.

203.    Each of these provisions violates public policy, including (without limitation) the policies set forth in Chapter 93A, and is therefore void, invalid, or voidable.

204.    Plaintiffs' agreement to these provisions was procured by ECW's fraud and the provisions are therefore void, invalid, or voidable.

205.    The provision cited in paragraph 197 above is also unenforceable for the following reasons:

　　　　a.    The provision only requires Plaintiffs to make a good faith effort to mediate their claims, because the provision does not require that give an arbitrator the power to make a binding decision.  But ECW rejected Plaintiffs' offer to engage in classwide mediation Plaintiffs' efforts to mediate their claims. As a result, there was an "unsuccessful resolution" of the parties' disputes, and therefore an "action at law" may be taken under the express terms of the provision.

　　　　b.    Insofar as the provision is read to require arbitration and not mediation, the provision is not enforceable under the Federal Arbitration Act because it purports to require arbitration of "any dispute" but the Federal Arbitration Act only permits a pre-dispute arbitration clause for disputes "arising out of [the] contract or transaction, or the refusal to perform the whole or any part thereof."  *See* 9 U.S.C. § 2.

c.      Insofar as the provision is read to require arbitration and not mediation, the provision is not enforceable under the Federal Arbitration Act because the provision expressly permits litigation in the event of an "unsuccessful resolution by arbitration" and therefore does not require the parties "to settle by arbitration a controversy," as required by 9 U.S.C. § 2.

d.      Insofar as the provision is read to require arbitration and not mediation, the provision is not enforceable because ECW entered into a Corporate Integrity Agreement dated May 30, 2017 that contains the following provision: "eCW must not restrict or prohibit, by contract or otherwise, the rights of Existing Customers, former customers, or any new customers or users of eCW's EHR Software to discuss problems with eCW's EHR Software or associated services in any forum whatsoever, and eCW agrees that it will not enforce any rights it has under contracts with Existing Customers or former customers that restrict or prohibit those Existing Customers or former customers from discussing problems with eCW's EHR Software or associated services in any forum whatsoever."  A true and correct copy of this Corporate Integrity Agreement is attached hereto as Exhibit 4.  ECW is bound by the Corporate Integrity Agreement and therefore waived the right to enforce a provision purportedly restricting Plaintiffs' rights to bring their claims to this Court or requiring Plaintiffs to bring their claims to an arbitrator instead.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Proposed Class and Subclasses

pray for relief and judgment against ECW, as follows:

a.   For a declaratory judgment holding that the contractual provisions cited in Count IX are unenforceable, void, voidable, and/or otherwise invalid;

b.   For an order certifying the Proposed Class, appointing Plaintiffs and their counsel to represent the Class, and for notice to the Class to be paid by ECW;

c.   For an order certifying the Credit Provision Subclass, appointing Plaintiff Carrollton Family Clinic and their counsel to represent the Subclass, and for notice to the Subclass to be paid by ECW;

d.   For an order certifying the Compliance Provision Subclass, appointing Plaintiffs and their counsel to represent the Subclass, and for notice to the Subclass to be paid by ECW;

e.   For actual damages suffered by Plaintiffs and the Proposed Class and Subclasses;

f.   For trebling of damages suffered by Plaintiffs and the Proposed Class and Subclasses pursuant to Chapter 93A;

g.   For restitution to Plaintiffs and the Class of all monies wrongfully obtained by ECW;

h.   For Plaintiffs' reasonable attorneys' fees, as permitted by law;

i.   For Plaintiffs' costs incurred;

j.   For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

k.   For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Dated: December 21, 2017          Respectfully submitted,


By: *s/ John Roddy*
          John Roddy

BAILEY GLASSER LLP
John Roddy
Email:  jroddy@baileyglasser.com
99 High Street, Suite 304
Boston, MA 02110
Telephone:  (617) 439-6730
Fax:  (617) 951-3954

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Jonathan D. Selbin (*pro hac vice* to be submitted)
Email:  jselbin@lchb.com
John T. Nicolaou (*pro hac vice* to be submitted)
Email:  jnicolaou@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Fax:  (212) 355-9592

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Mark P. Chalos (*pro hac vice* to be submitted)
Email:  mchalos@lchb.com
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219-2423
Telephone:  (615) 313-9000
Fax:  (615) 313-9965

BADHAM & BUCK, LLC
Walker Percy Badham III (*pro hac vice* to be submitted)
Email: pbadham@badhambuck.com
Richard Doorman (*pro hac vice* to be submitted)
Email: rdoorman@badhambuck.com
Brett Ialacci (*pro hac vice* to be submitted)
Email: bialacci@badhambuck.com
2001 Park Place, North Suite 500
Birmingham, AL 35203
Telephone:  (205) 521-0036

*Attorneys for Plaintiffs*